**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| Francetta Savage, as Administrator for the Estate of Justin Barrett McCarrell;,    ) | C/A No.: |
| ) | **COMPLAINT** |
| ) | |
| Plaintiffs,    ) | |
| ) | |
| v.    ) | |
| ) | |
| Greenville County Sheriff's Office; Deputy Matthew Broad, in his    ) | |
| ) | |
| individual capacity; Sergeant Joseph Corneroli,    ) | |
| in his individual capacity; and Captain Bobby    ) | |
| Duncan, in his individual capacity.    ) | |
| ) | |
| Defendants.    ) | |

---

## PLAINTIFF'S COMPLAINT

NOW COMES Francetta Savage, as Administrator for the Estate of Justin Barrett McCarrell, deceased, and for Amanda Brown, Decedent's Mother, complaining of Defendants Greenville County Sheriff's Office, the County of Greenville, South Carolina, Deputy Matthew Broad, Sergeant Joseph Corneroli, and Captain Bobby Duncan, and for cause would show the Honorable Court as follows:

## PARTIES

1.     Plaintiff, Francetta Savage (hereinafter "Plaintiff Savage") is the duly appointed Administrator of the Estate of Justin Barrett McCarrell, Deceased, and the decedent's sister, and is a resident of the State of South Carolina with an address at 10 Cotswold Terrace, Taylors, SC. She is bringing the survival claim on behalf of the estate and the wrongful death claim pursuant to S.C. Code Ann. § 15-51-10 on behalf of the wrongful death beneficiaries.

1

2.      The Greenville County Sheriff's Office ("GCSO"), is a governmental entity established under the laws and constitution of the State of South Carolina, transacting and conducting business in Greenville County, South Carolina, and with a principal place of business at 4 McGee Street, Greenville, SC 29601. At all times relevant to this Complaint, Defendant GCSO was responsible for preventive, investigative, and enforcement services for all citizens of the County of Greenville, South Carolina.

3.      Upon information and belief, Defendant Deputy Matthew Broad (hereinafter "Defendant Broad") is a citizen of South Carolina and resides in Greenville County, and, at all relevant times, was a police officer and/or deputy with and employed by the Greenville County Sheriff's Office.

4.      Upon information and belief, Defendant Sergeant Joseph Corneroli (hereinafter "Defendant Corneroli") is a citizen of South Carolina and resides in Greenville County, and, at all relevant times, was a police officer and/or deputy with and employed by the Greenville County Sheriff's Office.

5.       Defendant Captain Bobby Duncan (hereinafter "Defendant Duncan") is a citizen of South Carolina and resides in Greenville County, and, at all relevant times, was a police officer and/or deputy with and employed by the Greenville County Sheriff's Office.

## JURISDICTION AND VENUE

6.      Jurisdiction exists in this Honorable Court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought pursuant to 42 U.S.C. § 1983 to redress a deprivation of the Fourth and Fourteenth Amendment rights of the decedent, Justin Barrett McCarrell. Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to adjudicate pendent state law claims.

7.      This Court further has personal jurisdiction over all Defendants as they reside in this District and their acts and/or omissions complained of occurred within this District.

8.      Venue is proper in this Court as Defendants' constitutional violations and intentional torts and otherwise violative conduct occurred in Greenville County within the District of South Carolina.

## SUMMARY OF FACTS

9.      United States Department of Homeland Security and the Greenville County Sheriff's Department orchestrated a calculated entrapment and ambush that resulted in the killing of Justin Barrett McCarrell, a low-level drug dealer with limited means.

10.     United States Department of Homeland Security agents from El Paso, Texas, posing as members of the Mexican Cartel, arranged for Justin to purchase 10 kilograms of cocaine for $150,000. During the transaction, one undercover agent suddenly drew his firearm, identified himself as law enforcement, and attempted to shoot Justin—but his weapon misfired.

11.     Mr. McCarrell, holding a firearm in his non-dominant hand, was fleeing outside, through the door he had just opened. Despite multiple deputies stationed outside ready to arrest him, a deputy inside shouted "Stop," and Deputy Broad fired eight rounds as Justin turned. After collapsing outside, officers tasered him multiple times and punched him in the face. He was taken to the hospital, where he died on the operating table.

## SUMMARY OF CLAIM

12.     On November 7, 2023, Justin Barrett McCarrell was wrongfully and unlawfully shot and killed by Deputy Matthew Broad, a police officer with the Greenville County Sheriff's Office.

13.    This is an action brought by the Plaintiff against the Defendants, County of Greenville, South Carolina, and the Greenville County Sheriff's Office and its/their agent and servant, Deputy Matthew Broad, a police officer with the Greenville County Sheriff's Office, for Broad's use of excessive and deadly force under the color of state law resulting in the death of Justin Barrett McCarrell in violation of his rights under the Fourth Amendment of the United States Constitution secured pursuant to 42 U.S.C. § 1983.

14.    Plaintiff brings this action pursuant to South Carolina's survivorship statutes as the duly appointed executrix of the Estate of Justin Barrett McCarrell.

15.    Plaintiff brings this action pursuant to South Carolina's wrongful death statute on behalf of Justin Barrett McCarrell's wrongful death beneficiaries.

16.    Plaintiff alleges that Defendant Broad violated decedent McCarrell's constitutional rights when he unlawfully and wrongfully killed him by shooting him eight times, including four shots in the back, when McCarrell was trying to flee.

17.    Plaintiff alleges that the Greenville County Sheriff's Office failed to properly train, supervise, screen, discipline, transfer, counsel or otherwise properly equip and control officers including those who are known, or who should have been known, to engage in the use of excessive force and/or deadly force.

18.    The Greenville County Sheriff's Office had a duty, but failed, to implement and/or enforce training, policies, practices and procedures for the Greenville County Sheriff's Office that respected decedent McCarrell's constitutional rights.

19.    Defendant Greenville County Sheriff's Office's failure to adequately supervise, discipline, and train Defendant Broad, failure to implement the necessary policies and

4

procedures, and affirmative implementation of unconstitutional policies caused McCarrell's unwarranted and excruciating physical and mental anguish and death.

20.     For these civil rights violations and other causes of action discussed herein, Plaintiff seeks redress and compensation for damages and the wrongful death of Justin Barrett McCarrell.

## UNLAWFUL AND WRONGFUL KILLING OF AND USE OF EXCESSIVE FORCE UPON JUSTIN BARRETT MCCARRELL

21.     In early 2023, United States Department of Homeland Security out of El Paso, Texas initiated contact with Justin Barrett McCarrell, a 36-year-old African American male, under the pretense of arranging a cocaine purchase.

22.     United States Department of Homeland Security agents from El Paso posed as members of a Mexican Cartel group, offering to sell Mr. McCarrell 10 kilograms of cocaine for $150,000, with an additional 5 kilograms for $50,000.

23.     At this time, Mr. McCarrell was successfully operating two legitimate businesses: one was home renovations and another was selling sneakers, both of which were profitable.

24.     United States Department of Homeland Security would constantly call Mr. McCarrell and even bothered him when he was on vacation in Puerto Rico

25.     After numerous calls to Mr. McCarrell, United States Department of Homeland Security arranged for the transaction to occur in Greenville County, South Carolina, renting an Airbnb residence at 100 Carver Street, Greenville, SC.

26.     Prior to the alleged drug deal, United States Department of Homeland Security wired and set up video cameras throughout the Airbnb residence

27.     On November 7, 2023, undercover United States Department of Homeland Security agents met Mr. McCarrell at a McDonald's, after which they proceeded to the 100 Carver Street residence.

28.     Mr. McCarrell arrived at 100 Carver Street at approximately 2:30 p.m., allegedly to complete the purchase of cocaine transported by United States Department of Homeland Security from Miami or El Paso to Greenville, South Carolina.

29.     This was a drug deal orchestrated by United States Department of Homeland Security agents posing as members of a dangerous criminal enterprise, specifically the Mexican Cartel.

30.     Given the inherently dangerous nature of this transaction, including the significant amount of money involved, the large quantity of cocaine, and interactions with individuals believed to be affiliated with the Mexican Cartel, both United States Department of Homeland Security and the Greenville County Sheriff's Department, including but not limited to Deputy Broad, knew or reasonably should have anticipated that Mr. McCarrell would be armed for his personal protection.

31.     Negotiations commenced inside the residence at 100 Carver Street with two undercover United States Department of Homeland Security agents. These agents were either so poorly trained or ill-prepared that one agent exited the residence to make a phone call and got locked out.

32.     There were also four Greenville County Sheriff's deputies, fully equipped with riot gear, helmets, bulletproof vests, and assault rifles, waiting concealed in a bedroom. Additionally, numerous law enforcement officers surrounded the property.

33.      During negotiations, Mr. McCarrell allegedly attempted to rob one of the undercover agents of the cocaine, pulling a gun which he had in his dominant right hand.

34.      United States Department of Homeland Security surveillance video shows Mr. McCarrell pointing a firearm with his dominant right hand.

35.      Deputy Broad observed the surveillance video feed from within the bedroom alongside other Greenville County Sheriff's Office (GCSO) deputies, monitoring Mr. McCarrell's actions.

36.      McCarrell then transferred the firearm to his non-dominant left hand and picked up the suitcase containing cocaine which the GCSO, including Defendant Broad, would have observed.

37.      At that moment, the one undercover United States Department of Homeland Security agent left in the room by himself, identified himself as a police officer and attempted to discharge his handgun (a P365 9mm); however, the weapon misfired.

38.      Mr. McCarrell immediately turned and fled toward the exit, dropping the suitcase filled with cocaine while continuing to hold the firearm in his non-dominant left hand, never attempting to fire his gun.

39.      Mr. McCarrell proceeded to the door, opened it with his dominant right hand, and began fleeing through the open doorway.

40.      Despite numerous law enforcement officers outside who were fully prepared to apprehend Mr. McCarrell and prevent his escape with the narcotics, Greenville County deputies, who had been concealed in the bedroom wearing full riot gear and were fully aware of the external officers, exited the bedroom. Defendant Broad aimed his assault rifle at Mr. McCarrell as he was exiting the residence and was in fact outside the door.

41.     Greenville County Sheriff's deputies unnecessarily shouted conflicting commands—"Hey, stop, stop, stop!"—as Mr. McCarrell fled, causing him to momentarily turn his head in response.

42.     At the time he was shot, Mr. McCarrell was fleeing the residence. He was struck multiple times—both in the front and back—despite the fact that escape was impossible, as the property was entirely surrounded by law enforcement officers positioned to apprehend him and to prevent his departure with the purported narcotics.

43.     To escape, Mr. McCarrell would have had to traverse the front yard and enter his vehicle while numerous officers, both on foot and in vehicles, were stationed outside waiting to arrest him if he emerged from the residence.

44.     Defendant Broad was fully aware that multiple officers were stationed outside the residence, as he had attended a detailed operational briefing immediately prior to the controlled sale and sting operation.

45.     After reviewing surveillance footage, Defendant Broad knew that Mr. McCarrell was holding a firearm in his non-dominant left hand while fleeing. Nonetheless, Broad used the deputies' own shouted commands—causing McCarrell to momentarily turn—as justification to open fire, later claiming that he acted out of fear for his safety. That alleged "fear" was a pretext for a situation Defendant Broad and his fellow deputies had intentionally created.

46.     In his official statement to the South Carolina Law Enforcement Division ("SLED"), Defendant Broad admitted that Mr. McCarrell was exiting "at the front door of the house" and that Defendant Broad was "just inside" when he initially discharged three to four rounds.

47.     Defendant Broad fired a total of eight rounds from a Sauer Model MPX 9mm assault rifle, striking Mr. McCarrell four times in the back.

48.     Defendant Broad initially fired three to four rounds as Mr. McCarrell turned while exiting through the open front door. As Mr. McCarrell fell through the doorway, dropping his firearm, Defendant Broad advanced and fired an additional three to four rounds at the fallen and incapacitated man.

49.     As Mr. McCarrell fell through the doorway to the ground outside, Defendant Broad followed him, continuing to discharge his automatic rifle—striking Mr. McCarrell in the back, buttock, thigh, and forearm.

50.     While falling to the ground, Mr. McCarrell dropped his firearm onto the front step. Despite this, Defendant Broad continued to fire additional rounds.

51.     Defendant Broad was directly behind Mr. McCarrell and could clearly see the firearm drop onto the step immediately in front of him.

52.     At that point, no reasonable officer could have feared for his safety. Mr. McCarrell was unarmed, falling, and incapacitated, yet Defendant Broad continued to fire repeatedly into his back.

53.     Defendant Broad failed to activate his body-worn camera until several minutes after shooting Mr. McCarrell—an explicit and knowing violation of Greenville County Sheriff's Office policy.

54.     The Sheriff's Office policy requires that deputies activate body cameras immediately when a weapon is present, alleged to be present, or during any use of deadly force.

55.     This incident indisputably involved both firearms and fatal force. Defendant Broad's failure to record the event constituted a flagrant and intentional breach of department policy designed to conceal his excessive use of force.

56.     The actions and tactics employed by the Greenville County deputies directly created the circumstances that led to the shooting and death of Mr. McCarrell.

57.     At the time he was shot, Mr. McCarrell was either exiting or had already exited the residence and faced immediate apprehension by multiple deputies and officers waiting outside.

58.     Nevertheless, Defendant Broad and others recklessly shouted conflicting commands, compelling Mr. McCarrell to turn back toward them—provoking the very movement they later used to justify deadly force.

59.     This reckless conduct directly caused the fatal shooting of Mr. McCarrell—an outcome entirely avoidable had the deputies refrained from issuing unnecessary and provocative commands.

60.     As Mr. McCarrell fled with his back toward the deputies, one deputy specifically shouted, "Stop! Stop! Stop!"—confirming that Mr. McCarrell was moving away from, not toward, the officers and posed no immediate threat.

61.     After Mr. McCarrell collapsed, severely wounded and incapacitated on the ground, deputies from the Greenville County Sheriff's Office further assaulted him—repeatedly deploying Tasers and striking him in the face while restraining him.

62.     Sgt. Joseph Corneroli, a member of the Greenville County Sheriff's Office SWAT team, exited the bedroom alongside Defendant Broad immediately following the shooting.

63.     Mr. McCarrell fell down the steps outside the residence, dropping his firearm in plain view.

64.     Despite his severe gunshot wounds, unarmed condition, and inability to resist, Defendant Corneroli deployed his Taser against Mr. McCarrell six separate times—an act of unnecessary, excessive, and sadistic force that exacerbated his injuries.

65.     Capt. Bobby Duncan, also a member of the Greenville County Sheriff's Office SWAT team, participated in the incident.

66.     While Mr. McCarrell lay unarmed, handcuffed, and incapacitated, Defendant Duncan further assaulted him by pressing his forearm across Mr. McCarrell's face and nose and striking him repeatedly with a closed fist, further aggravating his injuries.

67.     No lawful justification existed for Defendants Corneroli or Duncan to tase or strike Mr. McCarrell, who was already subdued, unarmed, and defenseless following the initial shooting.

68.     Mr. McCarrell was eventually handcuffed, placed on a stretcher, and transported to the hospital, where he succumbed to his injuries during emergency surgery.

69.     After the shooting and physical assault, Defendant Broad re-entered the residence to check on the undercover United States Department of Homeland Security agents. Only then—after the shooting and beating had concluded—did Defendant Broad finally activate his body-worn camera.

70.     Plaintiff avers that Defendant Broad knowingly and intentionally failed to activate his body-worn camera in violation of established policy to conceal his unlawful and excessive use of deadly force, to fabricate a false narrative of self-defense, and to suppress evidence of the unconstitutional killing of Mr. McCarrell.

71.    Mr. McCarrell was clearly not a significant drug trafficker. He maintained two legitimate jobs, lacked personal transportation, borrowed a vehicle for this transaction, and lacked the financial means to purchase the drugs in question.

72.    United States Department of Homeland Security —an agency with access to some of the most advanced surveillance and intelligence-gathering technology in the world—should have known that Mr. McCarrell neither possessed nor had the financial means to obtain $150,000.

73.    Their failure to recognize this raises serious questions about the legitimacy and intent of the operation.

74.    No evidence exists to indicate that Mr. McCarrell fired his handgun during the incident.

75.    Additionally, there is no evidence supporting any claim that Mr. McCarrell attempted an inaudible misfire of his handgun during the incident.

76.    The actions taken by Defendant Broad and the Greenville County Sheriff's Office in this incident represent an extreme and egregious abuse of authority and excessive force.

77.    Defendant Broad has previously been involved in at least two other fatal officer-involved shooting, occurring in 2016 and 2021.

78.    Specifically, in the 2016 incident, Defendant Broad shot a man walking near a shopping center who neither pointed nor discharged his firearm.

79.    No body camera footage was available from Defendant Borad for the 2016 fatal shooting incident.

80.    In the 2021 incident, Defendant Broad was one of three SWAT deputies who shot and killed a man who was threatening suicide by pointing a gun at his own head.

81.     Repeated fatal shootings involving a single officer are extremely rare.

82.     Multiple fatal shooting incidents involving Defendant Broad demonstrate significant failures in departmental oversight, officer conduct, and training protocols within the Greenville County Sheriff's Office.

83.     Greenville County Sheriff's deputies deliberately ambushed and killed Mr. McCarrell.

84.     Despite multiple officers being present who could apprehend Mr. McCarrell without resorting to deadly force, Defendant Broad intentionally shot McCarrell multiple times as he attempted to flee, even though Mr. McCarrell clearly posed no immediate threat.

85.      Due to the severe misconduct, evident excessive use of force, and egregious violations of Mr. McCarrell's civil rights, Defendants are liable for all damages resulting from his wrongful death.

86.     The South Carolina Law Enforcement Division's Investigative Report ("SLED Report"), dated January 12, 2024, regarding the shooting, Tasing, beating, and killing of Mr. McCarrell, is inaccurate because it failed to consider all pertinent facts as set forth in this Complaint.

## FAILURES OF THE GREENVILLE COUNTY SHERIFF'S OFFICE (GCSO)

### Pattern and Practice of Excessive Force by Deputy Broad

87.     On May 2, 2016, **Deputy Matthew Broad** shot and killed Reginald Dogan Sr., an African American male who was armed but did not point or discharge his weapon at Defendant Broad. At the time of the shooting, Mr. Dogan was walking along a road, visibly smiling, laughing, and shrugging his shoulders, presenting no imminent threat to Defendant Broad or

others. Mr. Dogan subsequently died at a local hospital. The details of this incident are documented in the SLED report number 34-16-0061.

88.     Despite the lack of justification for lethal force under these circumstances, Defendant Broad was neither disciplined nor subjected to additional oversight or retraining following this incident.

89.     On December 26-27, 2021, **Deputy Broad** participated in another fatal shooting incident involving Matthew D. Snyder, who was reportedly engaged in a domestic dispute and had threatened suicide. Snyder was initially observed firing shots in a wooded area. Later, Snyder was seen lying on the ground between a curb and a police vehicle, feet positioned toward law enforcement officers, and pointing a handgun at his own head.

90.     Snyder subsequently yelled, began to cry, and allegedly discharged his firearm in the general direction of deputies, who were protected by and near a BEARCAT armored SWAT vehicle. In response, Defendant Broad and two other deputies fired their rifles multiple times at Snyder, striking him with a total of 19 gunshots. Snyder died from his injuries. This incident is documented in SLED report number 34-21-0215.

91.     Following this second fatal shooting incident, Defendant Broad again received no disciplinary action, oversight, or specialized training aimed at preventing excessive or unwarranted use of force.

92.     Despite his involvement in these fatal shootings, Defendant Broad remained an active member of the GCSO SWAT Team at the time of the fatal shooting of Justin Barrett McCarrell in November 2023 and, upon information and belief, continues to serve in that capacity.

93.     These repeated incidents of deadly force without subsequent discipline or corrective action reflect an established pattern and practice by the GCSO of failing to supervise, discipline, and adequately train their deputies, including Defendant Broad, thus demonstrating deliberate indifference to the constitutional rights of citizens.

## THE GREENVILLE COUNTY SHERIFF'S OFFICE (GCSO) HAS A DOCUMENTED HISTORY OF EXCESSIVE FORCE AND CIVIL RIGHTS VIOLATIONS, DEMONSTRATED BY MULTIPLE RECENT SETTLEMENTS:

94.     GCSO paid a $300,000 settlement to Dianne Maros, whose son was a shoplifting suspect, after a deputy shot her in the stomach on October 20, 2019.

95.     Kenneth Langford, an autistic man, received a $600,000 settlement following severe injuries—including fractured ribs, a dislocated shoulder, and a 16-day hospitalization— inflicted by six GCSO deputies during a May 2020 traffic stop. Despite this incident, GCSO failed to amend its deputy training practices.

96.     Greenville County Sheriff's Office settled for $2.5 million in September 2024 for negligence resulting in the death of a man on August 31, 2020, who was detained at the Greenville County Jail for 17 days during a mental health crisis, resulting in severe dehydration and a 36-pound weight loss.

97.     In 2019 alone, GCSO-related civil rights abuses resulted in total settlements exceeding $1.8 million.

98.     GCSO settled for $22,500 in 2015 following the death of firefighter Jordan Howard during a high-speed chase involving sheriff deputies.

99.     In 2019, GCSO paid Freddrick Switzer $220,000 after deputies inflicted severe injuries, including a broken leg, during a traffic stop arrest.

100.    Kevin Leroy White received a $230,000 settlement in 2019 due to excessive force by a GCSO deputy utilizing a K-9 unit.

101.    Andrew C. Walker settled for $130,000 in 2019 after suffering extensive injuries from a prolonged canine attack by GCSO deputies during a 2015 arrest in an upstairs bedroom.

102.    Savannah Nabors was awarded a $195,000 settlement in 2019 after filing a lawsuit alleging rape by former Sheriff Will Lewis in 2017. Sheriff Lewis was later criminally convicted for misconduct in office.

103.    On July 11, 2020, five GCSO deputies fired 42 shots within three seconds at Michael Culbertson, a 26-year-old man weighing approximately 130 pounds. Culbertson was struck six times and killed while fleeing the deputies, who had jumped from a van and shouted commands at him.

104.    Culbertson had earlier fled from a traffic stop that day and was subsequently located on Long Forest Drive, a residential street near his grandparents' residence.

105.    At the time of the shooting, Culbertson was fleeing on foot holding a cell phone in one hand and a firearm in the other as deputies attempted to execute arrest warrants.

106.    Culbertson had active warrants from incidents occurring on June 27 and July 10, 2020, including charges of failing to stop for law enforcement, reckless driving, resisting arrest, and interference with police operations.

107.    The GCSO imposed no disciplinary action against any of the five deputies involved in Culbertson's fatal shooting.

108.    In July 2018, multiple GCSO deputies tased and physically beat Thomas Felton Jones until he lost consciousness. The incident occurred in Jones's own front yard after he questioned deputies about their traffic stop involving a woman who had arrived at his residence.

109.    The South Carolina Supreme Court subsequently overturned Jones's related conviction, ruling it unconstitutional.

110.    No disciplinary measures were enacted against the deputies who tased and physically assaulted Jones.

111.    In 2019, a GCSO deputy arrived at the residence of Dick Tench, a 62-year-old homeowner, at midnight in response to an alert activated by a device belonging to a family member present at Tench's home.

112.    After hearing loud banging on his front door at midnight, Tench approached the door carrying his legally authorized handgun, consistent with his concealed carry permit.

113.    Upon seeing Tench through a side window next to the door, the deputy shot Tench multiple times through the window. The deputy claimed Tench pointed the gun at him; however, body camera footage clearly contradicted this assertion, instead showing Tench walking away from the door when he was shot four times.

114.    The deputy then entered the residence, discovering Tench severely wounded and bleeding on the floor.

115.    Tench survived the shooting and subsequently initiated a civil rights lawsuit against GCSO alleging excessive force, resulting in a $650,000 settlement.

116.    Despite the clear excessive use of force and contradiction by body camera evidence, GCSO imposed no disciplinary action against the deputy responsible for shooting Tench in his own home during the night as he merely sought to protect his residence in response to the unexpected disturbance.

117.    No discipline was imposed on the deputy who shot Tench in his own house at midnight for doing nothing but approaching the door to protect his residence in response to loud banging which had woken him up.

118.    On December 27, 2023, Greenville County Sheriff's Office (GCSO) deputies discharged their weapons 43 times within 25 seconds at 81-year-old Walter Lester McDonald. Deputies shot and killed McDonald in his backyard despite the fact that he did not fire upon them. Prior to the incident, his wife had contacted the Sheriff's Office, expressing concerns about an alleged affair and indicating the presence of firearms in their home.

119.    On March 10, 2018, GCSO deputies shot and killed Jermaine Massey in his backyard during a mental health crisis. Massey had called 911 himself, disclosing that he was bipolar and explicitly stating he posed no threat to himself or his family. Despite holding a knife against his own chest and not threatening deputies, four deputies attempted two unsuccessful Taser deployments before firing a total of 11 shots, resulting in Massey's death.

120.    In March 2017, GCSO deputies killed Joseph Inabinet during a domestic dispute after he brandished a BB gun. Following an officer shouting "gun," four deputies fired 29 shots, resulting in Inabinet's death.

121.    In 2024, 21-year-old Daziam Lewis was fatally shot by GCSO deputies after she called 911 while in possession of a knife, seeking assistance during a crisis.

## SYSTEMATIC CUSTOM OF RACIAL DISCRIMINATION AND FAILURE TO DISCIPLINE EXCESSIVE FORCE

122.    According to a 2019 investigative report by the Greenville News, GCSO deputies shot 31 individuals, resulting in 19 fatalities over a ten-year period. This statistic represented one

out of every eight police-related fatalities statewide, indicating a disproportionately high number of officer-involved deaths attributable to GCSO deputies.

123.    All shootings carried out by GCSO deputies within this timeframe were deemed justified by internal reviews, and no disciplinary actions were imposed against any deputies involved.

124.    The Greenville News investigation also revealed that African Americans were disproportionately targeted and fatally shot by GCSO deputies at higher rates compared to other demographic groups.

125.    The 2019 National Police Scorecard reported that GCSO deputies accounted for 22 fatal shootings over the preceding decade, the highest number of officer-involved fatalities among law enforcement agencies statewide in South Carolina.

126.    In 2024 alone, there were 45 officer-involved shootings throughout South Carolina, seven of which were attributed to GCSO deputies.

127.    As of the date of this filing in 2025, there have already been four officer-involved shootings by GCSO deputies.

128.    The second fatal shooting in 2025 involving GCSO deputies occurred in March, resulting in the death of 75-year-old Jesse William Wright.

129.    On May 4, 2025, James Webster was fatally shot by a GCSO deputy responding to a domestic disturbance. This incident marked the fourth officer-involved shooting by GCSO deputies in 2025.

## COUNT I
## WRONGFUL DEATH ACTION

130.    Plaintiffs incorporate all preceding paragraphs herein by reference as though fully set forth.

131.    Plaintiff Francetta Savage, as Administrator of the Estate of Justin Barrett McCarrell, deceased, and Amanda Brown assert a claim under the South Carolina Wrongful Death Statute, S.C. Code Ann. § 15-51-10, on behalf of all persons legally entitled to damages resulting from the wrongful death of Justin Barrett McCarrell.

132.    Pursuant to S.C. Code Ann. § 15-51-10, the Defendants are liable because the death of Justin Barrett McCarrell was directly and proximately caused by their wrongful acts, negligence, and deliberate misconduct.

133.    Had McCarrell survived, he would have had a clear right of action against the Defendants for the egregious violations of his civil rights, including excessive and unjustified use of deadly force, regardless of whether the killing constituted a felony under criminal law.

134.    Plaintiff affirms that no other action has been filed to recover damages arising from the wrongful death of Justin Barrett McCarrell under the referenced statute.

135.    Plaintiff seeks all available damages permitted by the South Carolina Wrongful Death Statute, specifically including loss of future financial support, services, companionship, comfort, society, affection, guidance, education, and counsel that Justin Barrett McCarrell would have provided had his life not been violently and unlawfully terminated by Defendants.

136.    Plaintiff further seeks recovery of all medical expenses incurred due to the injuries inflicted upon Justin Barrett McCarrell.

137.    Plaintiff additionally claims reimbursement for all funeral and burial expenses directly resulting from McCarrell's wrongful and untimely death.

WHEREFORE Plaintiffs seek damages in excess of ten million dollars against the defendants plus all cost and attorney's fees and any other cost that the court may deem necessary.

## COUNT II
## SURVIVAL ACTION

138.    Plaintiffs incorporate all preceding paragraphs herein by reference as though fully set forth.at length.

139.    Plaintiff further asserts claims under the South Carolina Survival Statute, S.C. Code Ann. § 15-5-90, seeking all damages recoverable pursuant to said statute. These damages explicitly include lost earnings—both past and anticipated future income—as well as compensation for the severe pain, suffering, and emotional distress endured by Justin Barrett McCarrell from the onset of Defendants' egregious and unjustifiable use of excessive force until the moment of his death.

140.    Under S.C. Code Ann. § 15-5-90, claims for personal injury survive the death of the injured party, permitting the legal representative to pursue recovery for all conscious pain and suffering experienced by the deceased, as well as related medical expenses incurred due to Defendants' wrongful actions. *See Smalls v. S.C. Dep't of Educ.*, 339 S.C. 208, 216, 528 S.E.2d 682, 686 (Ct. App. 2000).

141.    The Defendants' actions constitute deliberate, willful, and reckless misconduct, warranting full and aggressive pursuit of all damages permitted by law to ensure accountability and justice for the egregious harm inflicted upon Justin Barrett McCarrell.

WHEREFORE Plaintiffs seek damages in excess of ten million dollars against the defendants plus all cost and attorney's fees and any other cost that the court may deem necessary.

### COUNT III
### FOURTH AND FOURTEENTH AMENDMENT VIOLATION: EXCESSIVE FORCE (AGAINST DEFENDANT BROAD, DEFENDANT CORNEROLI, AND DEFENDANT DUNCAN)

142.    Plaintiff incorporates all preceding paragraphs herein by reference as though fully set forth herein

143.    Defendant Broad violated Mr. McCarrell's Fourth Amendment rights when he shot him eight times without legal justification while Mr. McCarrell was fleeing from the residence, despite his imminent apprehension by officers positioned outside.

144.    Defendant Broad further violated Greenville County Sheriff's Office (GCSO) policies regarding body-worn cameras. According to GCSO orders, deputies must activate their cameras at the onset of encounters involving the potential for use of force, presence of weapons, or adversarial contacts.

145.    Defendant Broad intentionally failed to activate his body-worn camera at the start of his encounter with Mr. McCarrell and only activated it after the shooting had concluded.

146.    Notably, Defendant Broad previously failed to activate his body-worn camera during a fatal shooting incident involving Reginald Dogan Sr. in May 2016.

147.    Defendant Broad's conduct constituted an unreasonable seizure under the Fourth Amendment as he utilized deadly force against McCarrell without objective justification.

148.    The Fourth and Fourteenth Amendments prohibit unreasonable seizures, including the excessive use of force by police officers. *Graham v. Connor*, 490 U.S. 386, 395

(1989). Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id.* at 11.' "

*Henry v. Purnell*, 652 F.3d 524, 531-32 (4th Cir. 2011).Excessive force claims are evaluated based on objective reasonableness under the circumstances. *Id.* at 399.

149.    "The question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996).

150.    Police officers violate the Fourth Amendment by shooting a fleeing suspect absent probable cause to believe the suspect poses a significant threat of death or serious injury. *Tennessee v. Garner*, 471 U.S. 1, 3 (1985).

151.    Defendant Broad shot Mr. McCarrell as he fled, holding a gun in his non-dominant hand and clearly posing no immediate threat. No objectively reasonable officer would conclude that Mr. McCarrell posed imminent harm to the officers or others.

152.    Defendant Broad's eight-shot volley against Mr. McCarrell, including shots fired as Mr. McCarrell exited the residence, constitutes excessive force.

153.    Defendant Broad's actions were objectively unreasonable and unjustified, constituting excessive and deadly force.

154.    Such excessive and deadly force was neither necessary nor reasonable under the circumstances.

155.    Consequently, Defendant Broad violated Mr. McCarrell's Fourth Amendment rights against excessive force.

156.    Defendant Corneroli also violated Mr. McCarrell's Fourth Amendment rights by employing excessive force.

157.    After Defendant Broad shot Mr. McCarrell, causing him to fall onto the front yard and drop his weapon, Defendant Corneroli unnecessarily and egregiously deployed his Taser six times against Mr. McCarrell, who was unarmed and incapacitated.

158.    Defendant Duncan further violated Mr. McCarrell's Fourth Amendment rights by employing additional excessive force.

159.    While Mr. McCarrell was immobilized, having been shot eight times by Defendant Broad and Tased six times by Defendant Corneroli, Defendant Duncan unnecessarily and violently beat Mr. McCarrell by forcibly jamming his forearm against Mr. McCarrell's face and nose and striking him repeatedly with closed fists.

160.    There was no justification or basis for Defendant Corneroli and Defendant Duncan to taser Mr. McCarrell and punch him in the face when he was on the ground with no weapon after being shot 8 times and several additional officers outside arrested Mr. McCarrel.

161.    Their actions were not only excessive and unjustified but brutal and showed a real sign of hatred towards an African American male who was set up by the government and murdered.


WHEREFORE Plaintiffs seek damages in excess of ten million dollars against the defendants plus all cost and attorney's fees and any other cost that the court may deem necessary.


## COUNT IV

## DEPRIVATION OF RIGHTS IN VIOLATION OF FEDERAL LAW – EQUAL PROTECTION AND DUE PROCESS
## (AGAINST DEFENDANT BROAD, DEFENDANT CORNEROLI, AND DEFENDANT DUNCAN)

162.     Plaintiff incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

163.     The Fourteenth Amendment to the United States Constitution guarantees the rights to equal protection and due process under the law.

164.     Acting under color of state law, Defendant Broad, Defendant Corneroli, and Defendant Duncan deprived Mr. McCarrell of his constitutional rights in violation of 42 U.S.C. § 1983, including the rights to equal protection and due process.

165.     Defendant Broad, Defendant Corneroli, and Defendant Duncan targeted Mr. McCarrell, an African American, based on his race for participation in a drug sting operation and subjected him to excessive force, thereby violating federal law and the Equal Protection Clause of the United States Constitution.

166.     Due to these violations, Mr. McCarrell suffered severe injuries, significant pre-death pain and suffering, emotional distress, and loss of life.

WHEREFORE, Plaintiffs demand judgment against Defendant Broad, Defendant Corneroli, and Defendant Duncan, pursuant to 42 U.S.C. § 1983, for an amount exceeding $10 million, including interest, delay damages, court costs, survival and wrongful death damages, punitive and exemplary damages, attorneys' fees under 42 U.S.C. §§ 1985 and 1988, and any further relief the Court deems appropriate.

## COUNT V
## EIGHTH AMENDMENT VIOLATION CRUEL AND UNUSUAL PUNISHMENTAGAINST DEFENDANT BROAD, DEFENDANT CORNEROLI, AND DEFENDANT DUNCAN)

167.     Plaintiff hereby incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

168.    At the time of the events described, Defendant Broad, Defendant Corneroli, and Defendant Duncan, acting under color of state law and within the scope of their employment with the Greenville County Sheriff's Office, subjected Mr. McCarrell to excessive, unnecessary, and sadistic force in violation of the Eighth Amendment to the United States Constitution, made actionable under 42 U.S.C. § 1983.

169.    Defendant Broad could not have reasonably feared for his safety once Mr. McCarrell was falling forward through the doorway and onto the ground outside, having already been struck three to four times by Defendant Broad's initial gunfire.

170.    As Mr. McCarrell fell onto his stomach outside the residence, his firearm dropped from his hand and landed directly in front of Defendant Broad, who was pursuing him from only a few feet away. Defendant Broad was fully aware that Mr. McCarrell was unarmed and incapacitated.

171.    Despite this clear lack of threat, Defendant Broad continued to discharge his Sauer Model MPX 9mm assault rifle, firing additional rounds into Mr. McCarrell's back, buttock, thigh, and forearm. The continued use of deadly force under these circumstances was unnecessary, wanton, and carried out with deliberate indifference to human life, evidencing an intent to kill rather than to lawfully detain.

172.    After Defendant Broad's final shots felled Mr. McCarrell to the ground, Defendant Corneroli—having heard the gunfire and witnessing Mr. McCarrell bleeding and motionless—inflicted further pain and suffering by deploying his Taser against Mr. McCarrell six separate times. These repeated taser applications were unnecessary, punitive, and deliberately inflicted to cause further pain and suffering in violation of clearly established constitutional protections.

173.    While Mr. McCarrell lay unarmed, handcuffed, and gravely wounded, Defendant Duncan—also present at the scene—pressed his forearm across Mr. McCarrell's face and nose, obstructing his breathing, and repeatedly struck him in the face with a closed fist. Defendant Duncan's actions constituted a malicious and sadistic use of force for the very purpose of causing harm.

174.    The conduct of Defendant Broad, Defendant Corneroli, and Defendant Duncan was not the product of mistake, negligence, or legitimate law enforcement necessity. Rather, their actions were motivated by malice, retaliation, and a wanton disregard for the sanctity of human life.

175.    The repeated and unnecessary infliction of physical violence upon an unarmed, wounded, and incapacitated individual constitutes the very essence of cruel and unusual punishment prohibited by the Eighth Amendment.

176.    As a direct and proximate result of Defendants' conduct, Mr. McCarrell suffered excruciating pain, severe bodily injury, mental anguish, and ultimately death.

177.    The acts of Defendant Broad, Defendant Corneroli, and Defendant Duncan were undertaken intentionally, maliciously, and in reckless disregard of Mr. McCarrell's clearly established constitutional rights, entitling Plaintiffs to compensatory and punitive damages under 42 U.S.C. § 1983.

WHEREFORE Plaintiffs seek damages pursuant to 42 U.S.C. § 1983, in excess of ten million dollars against the defendants plus all cost and attorney's fees and any other cost that the court may deem necessary, including attorneys' fees under 42 U.S.C. §§ 1985 and 1988, and any other relief deemed just by the Court.

## COUNT VI
## MUNICIPAL LIABILITY
## (AGAINST DEFENDANT GREENVILLE COUNTY SHERIFF'S OFFICE)

178.    Plaintiff incorporates by reference all preceding paragraphs. of this Complaint as though fully set forth herein.

179.    A plaintiff can bring a § 1983 claim against a municipality either by demonstrating that a municipal policy or custom caused injury, or by showing that a failure to act reflecting deliberate indifference caused injury. *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019).

180.    Greenville County Sheriff's Office's conduct, particularly regarding Defendant Broad, Defendant Corneroli, and Defendant Duncan's actions, reflects a custom, practice, and deliberate indifference by Greenville County  Sheriff's Office.

181.    The policies, customs, and practices of Greenville County Sheriff's Office directly caused Defendant Broad to violate Mr. McCarrell's constitutional rights.

182.    Greenville County Sheriff's Office deprived McCarrell of his rights and privileges secured by the Constitution and federal law through systemic failures detailed herein.

183.    Policymaker Hobart Lewis knew of these ongoing systemic failures yet took no corrective actions, failing to adequately train deputies or enforce policies regarding excessive force. This deliberate indifference resulted in harm to Mr. McCarrell and other residents of Greenville County.

184.    Greenville County and the Sheriff's Office's widespread practice of excessive force, evidenced by numerous fatal officer-involved shootings, demonstrates deliberate indifference and insufficient training or enforcement of appropriate use-of-force policies.

185.    These deliberate failures were the moving force behind the violation of Mr. McCarrell's constitutional rights.

186.    Defendant Greenville County and Defendant Sheriff's Office consistently failed to enforce or implement effective policies, resulting in repeated excessive force incidents, including this case, highlighting a pattern of egregious and unlawful behavior.

187.    Defendants were aware of prior misconduct, but failed to take corrective actions, exhibiting deliberate indifference that directly caused harm to Mr. McCarrell.

188.    Despite prior knowledge, Greenville County and the Sheriff's Office failed to establish adequate policies, practices, and procedures to prevent future constitutional violations, demonstrating deliberate indifference toward the rights of citizens, including Mr. McCarrell.

189.    Defendants failed to adequately train deputies on proper use-of-force protocols and racial bias, directly resulting in repeated constitutional violations.

190.    Defendants have a documented history of engaging in similar unlawful conduct.

191.    Plaintiff seeks survival and wrongful death damages for Mr. McCarrell's injuries, pre-death pain and suffering, emotional distress, loss of life, and loss of enjoyment of life.

WHEREFORE, Plaintiffs demand judgment against Greenville County and the Greenville County Sheriff's Office pursuant to 42 U.S.C. § 1983, in excess of $10 million, including interest, delay damages, court costs, survival and wrongful death damages, attorneys' fees under 42 U.S.C. §§ 1985 and 1988, and any other relief deemed just by the Court.

## COUNT VII
## STATE LAW CLAIMS (ASSAULT, BATTERY, AND WRONGFUL DEATH) (AGAINST DEFENDANT BROAD, DEFENDANT CORNEROLI, AND DEFENDANT DUNCAN)

192.     Plaintiff incorporates by reference all preceding paragraphs. of this Complaint as though fully set forth herein.

193.     Defendant Broad, Defendant Corneroli, and Defendant Duncan intentionally caused extreme physical harm to Mr. McCarrell without justification, including shooting him eight times, repeatedly Tasing him, and physically striking him after he was incapacitated on the ground.

194.     Defendant Broad wrongfully caused McCarrell's death by intentionally shooting him without justification.

195.     Defendants committed assault and battery, resulting in McCarrell's severe injuries, pre-death pain and suffering, emotional distress, and ultimately, his death.

WHEREFORE, Plaintiffs demand judgment against Defendants Broad, Corneroli, and Duncan, in an amount exceeding $10 million, including interest, delay damages, court costs, survival and wrongful death damages, punitive damages, attorneys' fees, and any additional relief the Court deems appropriate.

Respectfully submitted, this 30th day of October, 2025.

**STROM LAW FIRM, LLC**
*s/ Bakari T. Sellers*
Bakari T. Sellers (SC Fed. ID # 11099)
Mario A. Pacella (SC Fed. ID # 7538)
Amy E. Willbanks (SC Fed. ID # 13537)
Alexandra Benevento (SC Fed. ID # 10734)
Matthew B. Robins (SC Fed. ID # 13313)
6923 N. Trenholm Road, Suite 200
Columbia, South Carolina 29206
Phone: (803) 252-4800
Email: bsellers@stromlaw.com
         mpacella@stromlaw.com
         awillbanks@stromlaw.com
         abenevento@stromlaw.com

mrobins@stromlaw.com

**MANDRACCHIA LAW LLC**

Charles D. Mandracchia, Esq.
272 Ruth Road
Harleysville, PA 19438
PO Box 1229
Skippack, PA 19474-1229-mailing
610-584-0700
cman@mmattorneys.com

*Pro Hac Vice application forthcoming*

*Attorneys for the Plaintiff*